**JACK FROST LABORATORIES, INC., Plaintiff,**

v.

**PHYSICIANS & NURSES MANUFACTURING CORPORATION, Defendant.**

No. 92 Civ. 9264 (MGC).

United States District Court, S.D. New York.

Oct. 17, 1995.

Jones & Askew, Atlanta, Georgia by Stephen M. Schaetzel, Daniel J. Warren, Roger D. Wylie, for plaintiff.

Felfe & Lynch, New York City by John Lynch, Alfred H. Hemingway, for defendant.

## OPINION

CEDARBAUM, District Judge.

Jack Frost Laboratories, Inc. sues Physicians & Nurses Manufacturing Corporation ("P & N") for infringement of Jack Frost's patents on microwavable gel packs. From July 24, 1995 to July 27, 1995, I held a separate bench trial pursuant to Fed.R.Civ.P. 42(b) of defendant's affirmative defenses that Jack Frost's patents are invalid because the invention covered by the patents was placed on sale more than one year prior to the date on which Jack Frost filed its patent application, and because Jack Frost made fraudulent representations to the Patent Office in its application. Jack Frost expressly waived its right to a jury trial with respect to those issues. Both sides consented to a separate bench trial.

After examining the documents, observing the demeanor of the witnesses, and considering the plausibility and credibility of the testimony, I make the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

### On-Sale Bar

■ 35 U.S.C. § 102(b) provides that "[a] person shall be entitled to a patent unless the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." The patent application which resulted in the issuance of U.S. Patent No. 4,756,311 (the "'311 patent") was filed on May 15, 1985. (PTX 1.) On May 31, 1988, an application was filed for a patent that was a continuation of the '311 patent. This application resulted in the issuance of U.S. Patent No. 4,920,964 (the "'964 patent"). For purposes of the on-sale bar, the subsequent application is treated as having been filed on the date on which the first application was filed. 35 U.S.C. § 120; *Cardinal of Adrian, Inc. v. Peerless Wood Prods., Inc.*, 515 F.2d

534, 538 (6th Cir.1975). Therefore, if Jack Frost sold the invention claimed in its patents before May 15, 1984, its patents are invalid.

It is undisputed that Jack Frost made a sale to a third party, Carolon, on May 9, 1984 of 96 gel packs. Therefore, in determining whether Jack Frost's patents are invalid because the invention was on sale before the critical date, the sole issue to be determined is whether the 96 packs sold to Carolon were made of the same material as the gel packs that were the subject of the patent application.

### A. The Testimony

#### 1. Lawrence Reid, Sr.

Lawrence Reid, Sr., the founder and president of Carolon, testified that he contacted Sam Francis, the president of Jack Frost, in early 1984 during his efforts to develop a microwavable "hot wrap" product. (Tr. at 12, 16–17.) Jack Frost had been the supplier of reusable instant cold packs for Carolon's "cold wrap" product since the early 1980's. (Tr. at 9–10.) Reid, Sr. testified that when he spoke to Sam Francis in early 1984, he asked him if the product on Jack Frost's price list with the item number "073" was microwavable. (Tr. at 17.) Francis told him that it was. (Tr. at 17.) Reid, Sr. asked Francis for samples of the 073 product, and Francis sent some. (Tr. at 17.) Carolon tested these samples in the microwave, then ordered 96 of the 073 gel packs, which were shipped to Carolon by Jack Frost on May 9, 1984 (Tr. at 18–20; JTX 29, 30.)

Reid, Sr. testified that Sam Francis was invited by Carolon to a meeting in November of 1984. (Tr. at 21–22, 26–27.) Francis accepted the invitation. (Tr. at 21–22.) At the meeting, Francis and Reid, Sr. discussed plans for Jack Frost to supply Carolon with a private label product. (Tr. at 22–23.) Reid, Sr. told Francis that he was thinking of patenting the "hot wrap" product, which consisted of Carolon's stretch support bandage and a Jack Frost gel pack. (Tr. at 24.) Francis appeared upset that Reid, Sr. wanted to apply for a patent that would include

his product. (Tr. at 25.) Francis left the room to make a phone call. (Tr. at 25.) He returned and said that he was upset. (Tr. at 25.) During the meeting, Francis agreed to make the private label product for Carolon. (Tr. at 25, 56–57.) There was no discussion of changes to the product that Carolon had bought from Jack Frost in May, except for a change in the color of the gel from blue to red. (Tr. at 27–28, 70–71.)

On January 9, 1985, Reid, Sr., on behalf of Carolon, agreed to purchase 50,000 gel packs from Jack Frost. (Tr. at 25; JTX 59.) When Carolon received the packs, they contained printing which had been added without Carolon's consent: "HOT PACK Manufactured for CAROLON COMPANY by JACK FROST LABS., INC., Product Owner, Patent Pending." (Tr. at 62; JTX 108, 109.) Carolon blacked out the print on the gel packs. (Tr. at 61–62; JTX 108.) Later the language was changed to read "Hot Pack manufactured for Carolon Company by Jack Frost Labs., Patent Pending." (Tr. at 62–63.) Carolon did not obliterate the lettering on those packs. (Tr. at 62–63.)

Reid, Sr. testified that he applied for a patent on the hot wrap, but his application was not granted. (Tr. at 52.) He has not produced a copy of the application in this litigation. (Tr. at 53.)

In December of 1988, Reid, Sr. received a letter from Jack Frost's lawyer requesting that Carolon cease the use of microwavable gel packs that infringed Jack Frost's patents. (Tr. at 29–30; JTX 117.) Carolon continued to produce its Hot Wrap product and Jack Frost never sued Carolon. (Tr. at 33–34.)

### 2. Lawrence Reid, Jr.

Lawrence Reid, Jr. is currently the president of Carolon. (Tr. at 77.) Reid, Jr. testified that he conducted various tests in connection with the development of the Carolon Hot Wrap product. He tested two other gel packs in addition to the Jack Frost gel pack. One was manufactured by 3M, the other by Kramer. (Tr. at 79.) Both of these packs would melt or form holes in the film when microwaved. (Tr. at 79–80.) In 1983, he requested samples of the Jack Frost hot/cold gel pack in connection with the Cold Wrap

product. (Tr. at 80–81.) In early 1984, he received samples from Jack Frost that he tested in the microwave. (Tr. at 81.) He tested the samples to failure. (Tr. at 83.) The pack "blew up like a balloon" after two minutes, and failed at the seams after three minutes. (Tr. at 83–84.) Through his tests he determined that the proper temperature of a gel pack is between 125 and 130 degrees Fahrenheit. (Tr. at 82.) He tested reusability of the packs by repeatedly heating and cooling them. (Tr. at 86.) He repeated this process 100 times on one pack. (Tr. at 86.) He microwaved the gel packs both in and out of the bandage wrap and found no difference in result between the two conditions. (Tr. at 87–88.)

Reid, Jr. testified that the samples he received from Jack Frost were similar in appearance to JTX 360, a pack made of nylon polyethylene, and did not resemble JTX 361 or JTX 365, packs made of high density polyethylene. (Tr. at 89–93.) Reid, Jr. testified that the samples were "trap printed," meaning that the print was on the inside of the packs rather than the outside. (Tr. at 90–91.) Reid, Jr. testified that the labels on the samples were not stickers, but were printed directly on the packs. (Tr. at 93–94.)

Reid, Jr. developed the microwaving instructions for the gel packs based on his test results and on microwaving instructions for food products. (Tr. at 97–111.) He copied the hot water heating instructions from Jack Frost's 073 pack. (Tr. at 113.) The microwaving instructions on Jack Frost's microwavable gel packs are almost identical to the ones Reid, Jr. developed. (Tr. at 134; JTX 48, 105, 132.)

Reid, Jr. also testified that he was present at the November 8, 1994 meeting between Reid, Sr. and Sam Francis. (Tr. at 114.) His account of the meeting was essentially the same as his father's. (Tr. at 114–18.)

Reid, Jr. testified that Sam Francis never told him anything about changing the composition of the packs. (Tr. at 124–25.) Reid, Jr. tested the red sample private label packs that Jack Frost sent and found their performance similar to the previous Jack Frost sample packs. (Tr. at 118–19.) The appear-

ance of the film in the red samples was the same as that of the 073 sample packs. (Tr. at 119.) The product that was finally delivered to Carolon had the same performance and appearance as the 073 packs. (Tr. at 123–24.) None of the Jack Frost packs he tested ever developed pinholes in the film. (Tr. at 132.) Reid, Jr. does not have in his possession any of the May 9, 1984 Jack Frost samples. (Tr. at 142.)

Reid, Jr. testified that Carolon only accepted Jack Frost's "patent pending" legend on the packs after Jack Frost threatened to stop delivery of the packs if Carolon wouldn't agree. (Tr. at 131.) After that, Carolon didn't buy any more packs from Jack Frost, and began to buy packs from other sources. (Tr. at 131.)

### 3. John Morehead

John Morehead, an employee of Carolon, testified as to tests he performed on the Jack Frost samples. (Tr. at 170–73.) He also testified that he was present for part of the November 8 meeting between Reid, Sr. and Sam Francis, but he left the room to take a telephone call. (Tr. at 177–78.) When Morehead returned to the room, the meeting had become "hostile," and Mr. Francis and Reid, Sr. were speaking loudly. (Tr. at 180–81.) Morehead has never seen the patent application filed by Reid, Sr. (Tr. at 183.)

### 4. Sam Francis

Sam Francis, president and sole shareholder of Jack Frost, testified at a deposition taken in March of 1994 that "there is a possibility that I was buying nylon poly premade bags in 1984. And when I—I did not know that they were microwavable or any idea during my testing because they were boilable. We had directions for boiling, never anything on a microwavable." (S. Francis Dep., 3/22/94, at 77.) At the same deposition Mr. Francis testified, "I was using a laminate in a premade bag, as best as I can remember. And I was using that in the boiling bag by putting it into a pan of rolling boiling water.... I had no idea that there would be any microwavability to it." (Id. at 132.) Mr. Francis testified that he bought the laminate from Flexicon "because I wanted something that would hold up in boiling water, and I knew I was having trouble with polyethylene holding up in boiling water." (Id. at 134.)

At his deposition, Mr. Francis testified that he tested polyethylene, including high density polyethylene, in the microwave and found that polyethylene used in a microwave melted or formed pinholes. (Id. at 126–27.)

At trial, Mr. Francis testified that he first sent samples of the "073" product to Reid, Jr. in February, 1983. (Tr. at 187–88; JTX 26.) He testified that at that time, the 073 product was not a standard product of Jack Frost and that he had placed the item on Jack Frost's price list in order to see if there was any interest in it. (Tr. at 192.) He testified that the original bags of the 073 product were made of opaque white film. (Tr. at 194.) These original bags were returned to the manufacturer because they leaked, and because the print on them was "too low." (Tr. at 193–95.) In July of 1983, Jack Frost used clear bags for its 073 hot/cold gel packs. (Tr. at 193, 195–96.) The gel packs sent to Carolon on May 9, 1984 were made of clear high density polyethylene and did not contain any printing. (Tr. at 197, 243.) The clarity of the film used in the packs was more clear than JTX 365, and about as clear as JTX 107. (Tr. at 299–301.) Francis testified that the packs had clear stick-on labels on the surface like the one on JTX 107. (Tr. at 239–40, 261–63.) He testified that he did not tell Reid, Sr. or anyone else at Carolon that these packs were microwavable. (Tr. at 197–98, 201–02.) He never tested in the microwave the 073 product he sent to Carolon on May 9, 1984. (Tr. at 259.) Francis testified that he did not have a commercially available product made of nylon polyethylene until he ordered nylon polyethylene from Flexicon in 1985. (Tr. at 236.) Francis testified that the test results reported in his patent for "polyethylene" were for "polyethylenes as a family." (Tr. at 243–49.)

Francis testified that Reid, Sr. brought up the subject of microwavability of the 073 gel pack at the November 8 meeting. (Tr. at 275–76.) Mr. Francis testified that Reid, Sr. told him that he had applied for a patent on the hot wrap product. (Tr. at 275.) Mr. Francis left the meeting and called his wife.

(Tr. at 277.) He told her that he was angry because Reid, Sr. wanted to apply for a patent on his product, and he was worried about Jack Frost's liability because he thought that the product was unsafe in the microwave. (Tr. at 277–78.) He told Reid, Sr. that the 073 product was made of high density polyethylene and that it was not microwavable. (Tr. at 279–80.) He had made a microwavable gel pack from a nylon polyethylene film before the meeting at Carolon in November of 1984, and he believes that he told the Reids at the meeting that he thought he had a product that could be microwaved. (Tr. at 281–83.) He agreed at the meeting to provide Carolon with a microwavable private label product. (Tr. at 285.)

Francis testified that he discovered the microwavability of a gel pack made of a nylon polyethylene film in June of 1984. (Tr. at 304–05.) He had one or two samples with which he experimented. (Tr. at 304–05.) He tested the one or two samples in one minute increments—he did not test them to destruction. (Tr. at 305.)

Francis testified that he did not copy Reid, Jr.'s microwave instructions, but wrote his own instructions based on his experiments. (Tr. at 286–88.)

On December 10, 1984, Francis sent Reid, Jr. two sample packs containing red gel and made of nylon polyethylene. (Tr. at 203–04; JTX 9.) On December 18, 1984, Francis asked Flexicon for a price quote on 50,000 nylon polyethylene pouches for Carolon and 100,000 pouches for Jack Frost's microwavable packs. (Tr. at 208–09.) In February of 1985, Jack Frost ordered 50,000 printed pouches for Carolon's Hot Wrap pack and 50,000 for the Jack Frost 073 product. (Tr. at 212–13; JTX 142.) Francis testified that the first time Jack Frost received premade nylon polyethylene pouches was in June of 1985. (Tr. at 226.) He testified that the samples he sent to Carolon in December of 1984 could have been made from sample film that Jack Frost had received from Flexicon. (Tr. at 227.)

Francis testified that the private label gel packs he delivered to Carolon were made of nylon polyethylene and were microwavable. Francis did not tell Reid, Sr. that he had substituted a different kind of plastic film in the product. (Tr. at 292.)

Francis testified that the product number "073" designates type and size of a product. "07" designates a non-insulated gel pack and "3" designates the size of the pack. (Tr. at 328–29.)

Francis testified that he changed the artwork on the Carolon gel packs without asking permission. He changed the legend to read: "Hot Pack manufactured for Carolon Company by Jack Frost Labs, product owner, patent pending." (Tr. at 294.)

The first time Francis sold a gel pack made of a two-layer film was when he sold the Carolon Champ Hot Packs. He now thinks that high density polyethylene could be used to make microwavable gel packs. (Tr. at 343–44.)

### 5. Cynthia Francis

Cynthia Francis began working for Jack Frost full-time in 1988. (Tr. at 351.) When Francis was experimenting with microwavable gel packs, she helped him record the results of the tests. (Tr. at 353.) Mrs. Francis testified that the first time she observed her husband doing microwave tests on gel packs was just before Easter of 1984. (Tr. at 355.) She testified that her husband first saw a patent attorney about microwavable gel packs in early 1984. (Tr. at 356–57.) She doesn't know whether her husband had done any microwave testing before meeting with the patent attorney. (Tr. at 359–62.)

Mrs. Francis is the custodian of Jack Frost's documents. (Tr. at 374.) She does not know what happened to the papers that were attached to a letter from Mr. Francis to his patent attorney dated May 21, 1984 (JTX 217). (Tr. at 373–76.)

Jack Frost has never received a returned 073 product that leaked because the film melted in the microwave and formed pinholes. (Tr. at 408.) She has seen packs that were returned because they leaked at a seam. (Tr. at 408.)

Jack Frost's record retention policy with respect to accounts receivable records is to keep such records for seven years. (Tr. at

422.) Jack Frost's accountant, Frank Voyten, took care of all of the accounting records and he would have been responsible for purging those files. (Tr. at 423–28.) Mrs. Francis testified that she never directed the destruction of any Jack Frost documents during the period that she was employed full-time by Jack Frost. (Tr. at 429.)

In 1988 or 1989, Mrs. Francis directed her secretary to collect all of the files relating to Carolon in order to be prepared in the event that Jack Frost engaged in patent litigation with Carolon. (Tr. at 442–44.) She never looked through the documents that her secretary collected. (Tr. at 444–46.) When Jack Frost responded to the document requests in this litigation, she looked through the correspondence files, but the file for 1984 was not there. (Tr. at 449.) The 1984 correspondence file was found for the first time when Jack Frost's counsel came to their offices to search for documents. (Tr. at 449–50.)

Mrs. Francis did not conduct an inventory of Jack Frost's files when she started full-time employment in 1988—therefore, she does not know whether the files were complete at that time. (Tr. at 457.)

### 6. Darrell Morrow

Dr. Morrow is an expert in packaging engineering and materials science. (Tr. at 487–88; JTX 101.) Dr. Morrow testified that high density polyethylene film of the same clarity as the film used to manufacture P & N's hot/cold gel pack (JTX 365) was not available until 1987. (Tr. at 495–96, 504.) JTX 361 is an example of the high density polyethylene film that was available in 1984. (Tr. at 500.) All of the high density polyethylene film available in 1984 was opaque, with some "contact clarity"—that is, where blue gel contacts the bag, the bag appears blue. (Tr. at 500–05, 575–77.) There are currently some kinds of "oriented" high density polyethylene that have a clarity that approaches the clarity of nylon polyethylene, but those were not available prior to 1987. (Tr. at 549.)

Based on tests he performed on gel packs made of various materials and based on the testimony of the witnesses regarding the appearance of the May 9, 1984 gel packs and the tests performed on those gel packs, it is Dr. Morrow's opinion that the bags could not have been made of high density polyethylene. (Tr. at 509.)

### 7. Joe Harrington

Joe Harrington is currently an employee of Jack Frost. (Tr. at 594.) Harrington testified that he saw a material that he was told was high density polyethylene in 1984 when he was working at a job at General Packaging and Equipment Corp. (Tr. at 604–05, 634–35.) He described the appearance of the film as "semi-clear" with external printing. (Tr. at 605.) He believes that film he saw at that time was clearer than JTX 365, but not as clear as JTX 107. (Tr. at 606–07, 638.)

Shortly before trial, Harrington performed tests on gel packs he made of high density polyethylene film in a 750–watt microwave oven. (Tr. at 647; JTX 326a, 326b.) Harrington microwaved two bags for two minutes each, one bag for four minutes and another for five minutes. (JTX 326a, 326b.) Videotapes of the tests were shown at trial. (JTX 326a, 326b.) The bags microwaved for two minutes puffed up in the microwave, but did not form any pinholes or leak. (Tr. at 612–15; JTX 326a, 326b; PTX 1507, 1508.) The bags microwaved for four and five minutes formed pinholes and leaked. (Id.) Harrington microwaved an additional two packs for two minutes each, one in a wrap and one without a wrap, and observed the same results as with the other packs which were microwaved for two minutes. (Tr. at 616, 651; PTX 1506.) Harrington did not stop the test at any time between the two minute and four minute periods in order to ascertain whether the bags had developed pinholes or lost elastic memory. (Tr. at 654.) Microwave tests were performed on each bag only once. (Tr. at 653.)

Harrington used white opaque high density polyethylene rather than clear high density polyethylene because the white film was readily available to him from manufacturers in Florida, whereas clear film was not. (Tr. at 641–42.) Harrington testified that Mr. Francis asked him to make up the samples,

but did not specify whether the film should be clear or opaque. (Tr. at 643.)

According to Harrington, the term "073" means that the product is a noninsulated, microwavable gel pack 4½ inches wide by 10½ inches long. (Tr. at 627.) He has worked for Jack Frost for seven years. (Tr. at 627.) In the time he has worked for Jack Frost, the "073" product has always been microwavable. (Tr. at 627.)

### B. The Documents

Jack Frost does not have any business records in its possession that show the composition of the May 9, 1984 gel packs—it does not have any invoices or purchase orders for film before 1985. The only document that plaintiff points to as evidence of the composition of the gel packs is a letter dated May 9, 1984 from Sam Francis to Lawrence Reid, Sr. in which Francis states:

I would like to offer you a product I feel will be as successful as the instant cold pack.

\* \* \* \* \* \*

As we discussed, the only difference is this bag is a little stiffer to the touch.

\* \* \* \* \* \*

We have used this structure with our instant hot pack, because of the high density of the polyethylene it will take heat up to 200 degrees F where the low density will not. The heat will melt the bag causing the hot liquid to leak on the floor where as the high density polyethylene can withstand the build up of the heat and not melt the bag. As we discussed, if for any reason you do not like the feel of the bag you can return it to Jack Frost. I can assure

you we have never had a complaint from a customer on the feel of the material.

\* \* \* \* \* \*

Also, as we discussed, I have some more ideas dealing with heat that I feel you will be very interested in, but I need some time to work on it.

This letter by itself is not convincing evidence that the packs sold to Carolon in May of 1984 were made of high density polyethylene in light of Mr. Francis' testimony at trial indicating that he did not know the difference among different types of polyethylene film and did not appear to understand the definition of a "laminate." (*See* Tr. at 244–52.) [1]

### C. Witness Credibility

Since there are no documents that establish what materials were used to make the May 1984 gel packs, the determination of whether the film used in those packs was a nylon polyethylene laminate rests on circumstantial evidence and the credibility of the witnesses.

Although Sam Francis testified that the bags he sold in May of 1984 were made of high density polyethylene, I find that his trial testimony on this issue lacked credibility in light of his demeanor, the testimony of the other witnesses, the documents, and his own prior sworn statements. I credit his earlier admissions. For example:

- Mr. Francis testified that the film used in the packs he supplied was clearer than JTX 365 (a translucent film made of high density polyethylene) and JTX 107 (a clear film made of nylon polyethylene). However, Dr. Morrow, whom I found to be a very credible witness and extremely knowledgeable in his field, testified that high density polyethylene film of the same clarity as JTX 365 was not available until 1987.

---

1. An additional reason to discount the evidentiary value of this letter is that P & N has raised some serious questions as to the letter's authenticity. The letter was not discovered until after P & N made a motion for summary judgment on the on-sale bar issue. In all of the other letters from Sam Francis to the Reids during that time period, Francis addressed them by their first names, whereas the May 9, 1984 letter begins: "Dear Mr. Reid." At trial, plaintiff produced the entire 1984 reading file of documents in which

this letter was found. P & N submitted the report of a forensic document examiner who noted several discrepancies in 14 documents in the file, including the May 9 letter, which indicated that the documents were not created contemporaneously with the rest of the documents in the file. (*See* Report of John Paul Osborne, dated August 4, 1995.) Because the May 9 letter is not convincing evidence, it is unnecessary to decide whether the letter is authentic.

Plaintiff did not offer any expert testimony to the contrary. Moreover, when Joe Harrington performed tests on gel packs made of high density polyethylene, he searched for, but was unable to obtain, clear high density polyethylene film.

• Mr. Francis testified at trial that he did not have a commercially available product made of nylon polyethylene film until February 1985 when he ordered the bags to make the Carolon gel packs. However, at his deposition on March 22, 1994, Mr. Francis testified that he had been making boilable gel packs from nylon polyethylene in 1984. The credibility of Mr. Francis' trial testimony is seriously undermined by documents showing that Jack Frost requested price quotes on large quantities of nylon polyethylene film in 1983. (Tr. at 237–38; JTX 5, 6.)

• Mr. Francis testified that when Reid, Sr. told him that he was thinking of patenting the hot wrap as a microwavable product, Mr. Francis was concerned about the potential liability for Jack Frost because he didn't think that the product was safe in the microwave. Yet, Francis testified that he changed the film used in the packs without notifying the Reids and printed the microwave instructions on the Carolon packs that Carolon had written based on their testing of the May 1984 packs. Reid, Sr. and Reid, Jr. testified that there was no difference in the appearance of the May 1984 and February 1985 packs except for the color of the gel. Reid, Jr. also testified that he tested the February 1985 packs and that their performance in the microwave was the same as that of the May 1984 packs.

• Mr. Francis testified at trial that he did not bring up the subject of the microwavability of the gel packs at the November 8, 1984 meeting at Carolon—Reid, Sr. brought it up. At his deposition, Mr. Francis testified that he brought up the subject of microwavability at the meeting. (S. Francis Dep., 9/13/94, at 158.) It appears that Mr. Francis did not contact an attorney about patenting the microwavable pack until after the meeting at Carolon. Mr. Francis received a letter from his patent attorney, dated November 14, 1984, that stated, "I have opened the following files: 5680.1801—COLD PACK, MICROWAVE."

• Mr. Francis testified that he didn't perform microwave tests on the 073 gel packs listed on Jack Frost's price list in 1984. (Tr. at 236.) Later in his testimony, Mr. Francis said that he did perform microwave tests on 073 gel packs in 1984. (Tr. at 257–58.)

• Mr. Francis testified on direct examination that he was present for part of the testing done by Harrington. (Tr. at 264–68.) On cross examination, he testified that he was not present when Harrington performed the tests. (Tr. at 341–42.)

• Mr. Francis signed a declaration on January 31, 1994 in which he stated that he tested many different types of film in connection with his development of the microwavable gel pack, including high density polyethylene, low density polyethylene and linear low density polyethylene. (JTX 251.) The declaration stated that through testing he discovered a film that held up in the microwave—nylon polyethylene. (JTX 251.) At trial, when asked if high density polyethylene was not suitable for microwaving, Mr. Francis testified that he didn't find high density polyethylene unsuitable—rather he found that polyethylene was unsuitable. (Tr. at 248–49.) When asked if he tested high density polyethylene, Mr. Francis responded, "I tested polyethylenes as a family of polyethylenes." (Tr. at 249.)

• Mr. Francis testified that the meeting at Carolon on November 8, 1984 "was on a Saturday. I couldn't call anybody else. I called my wife." (Tr. at 277.) However, November 8, 1984 was a Thursday. (See Tr. at 693.)

• Mr. Francis testified that he had one or two samples of nylon polyethylene packs that he microwaved repeatedly in one minute increments and that he did not microwave to failure. (Tr. at 304–05.) However, at his deposition, Mr. Francis testified that he would always start out testing packs at four minutes. (S. Francis Dep., 3/22/94, at 157; Tr. at 307.)

• In general, eliciting testimony from Mr. Francis was very difficult. He was not a forthcoming witness. (*See* Tr. at 243–55, 279–83, 292, 704–05.)

The testimony of Cynthia Francis also lacked credibility. When deposed in March of 1994, she could not remember when her husband began testing gel packs in the microwave. (*See* Tr. at 355.) At trial she remembered that he began testing before Easter of 1984. (Tr. at 355.) At her deposition, she stated that Mr. Francis first saw a patent attorney about the microwavable gel pack in 1984 or 1985. (*See* Tr. at 357.) At trial, she remembered that Mr. Francis first saw a patent attorney in early 1984. (Tr. at 357.) At her deposition, she testified that Jack Frost had no record retention policy and that she made all decisions to destroy documents. (*See* Tr. at 421–23.) At trial, she testified that Jack Frost's accountant (who is now deceased) would have destroyed financial records going back more than seven years. (Tr. at 421–26.)

Joe Harrington's testimony also lacked credibility. He testified that Mr. Francis didn't tell him what type of high density polyethylene film to get for the testing samples, yet he testified that he tried to get clear film for the samples. (Tr. at 641–43.) He did not explain why he wished to get clear rather than opaque film.

The testimony of Reid, Sr. and Reid, Jr. was credible. Although a question was raised as to whether Reid, Sr. ever filed a patent application for the hot wrap, Reid, Sr.'s account of what happened at the November 8, 1984 meeting was corroborated by every witness who attended the meeting, including Mr. Francis.

The testimony of defendant's expert, Darrell Morrow, was totally credible. Dr. Morrow was thoroughly familiar with the properties of many different types of plastic films. Jack Frost offered no expert testimony to rebut Dr. Morrow's opinions. Jack Frost did

not challenge Dr. Morrow's conclusion that the May 9, 1984 gel packs were not made of high density polyethylene—rather, Jack Frost elicited testimony from Dr. Morrow that the materials used in the May 9, 1984 gel packs could have used a film which is not covered by the patent (for example, a three-layer film).[2] (Tr. at 571–74.)

## D. Burden of Proof

■ P & N bears the burden of proving invalidity under 35 U.S.C. § 102(b) by clear and convincing evidence. *Atlantic Thermoplastics Co. v. Faytex Corp.,* 970 F.2d 834, 836 (Fed.Cir.1992). Clear and convincing evidence is evidence "which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions [is] "highly probable." ' " *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 830 (Fed. Cir.1991) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 2438, 81 L.Ed.2d 247 (1984)).

■ The evidence of prior sale in this case meets the clear and convincing standard. I have an abiding conviction that the gel packs sold by Jack Frost to Carolon in May of 1984 were made of the same nylon polyethylene film as the gel packs on which Jack Frost ultimately obtained the patents at issue. I reach this conclusion based on: (1) the Reids' testimony regarding the appearance of the May 1984 gel packs and the microwave tests performed on them; (2) Sam Francis' admission at his deposition that he may have been using a nylon polyethylene laminate in his boilable gel packs in 1984; (3) Sam Francis' testimony at trial that the May 1984 gel packs had a high degree of clarity; (4) Dr. Morrow's testimony that high density polyethylene of the clarity described by Mr. Francis was not available in 1984; (5) the incredibility of Sam Francis' testimony that he substituted a different type of film in the packs he sent to Carolon in February 1985, but did not advise Carolon of this critical change; (6) the Reids' testimony that the

---

**2.** Jack Frost argues that a three-layer film is not within the scope of its patent claims because the patent only describes a film with a two-layer construction. P & N disagrees with this interpretation of the scope of the claims. It is unnecessary to decide whether the patent claims include a three-layer construction because Jack Frost has presented no evidence to suggest that the May 9, 1984 gel packs were made of any film other than high density polyethylene or nylon polyethylene.

appearance and performance of the May 1984 and the February 1985 gel packs were the same.

At the close of plaintiff's case, Jack Frost moved for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c) on the ground that P & N had not proved the identity of the invention by clear and convincing evidence. Jack Frost's argument rests primarily on the testimony it elicited from Dr. Morrow on cross examination that film other than nylon polyethylene could have been the film used in the May 1984 packs based on their appearance and performance in the microwave.

The fact that some other film *could* have been used in the May 1984 packs does not preclude the conclusion that it is "highly probable" that the packs were made of nylon polyethylene in light of all the evidence presented in this case. P & N does not bear the burden of proving that there is no other material of which the film could possibly have been made. P & N need only convince the trier of fact that it is "highly probable" that the packs that Jack Frost sold to Carolon in May 1984 were made of nylon polyethylene.

■ Although the ultimate burden of persuasion remains on the party asserting the on-sale bar affirmative defense, "if a *prima facie* case is made of public use, the patent owner must be able to point to or come forward with convincing evidence to counter that showing." *TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971 (Fed.Cir.) (discussing patent owner's burden regarding "experimental use" exception to § 102(b)), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984). P & N demonstrated by clear and convincing evidence that the gel packs sold to Carolon in February of 1985 were made of the same film as the gel packs sold to Carolon in May of 1984. Jack Frost's evidence to the contrary was not persuasive. The only film alternative suggested by Jack Frost through the testimony of Sam Francis and through the May 9, 1984 letter was high density polyethylene. P & N demonstrated by clear and convincing evidence that the packs were not made of high density polyethylene. There was no convincing evidence to the contrary.

Therefore, after carefully considering all of the evidence presented at trial, I find that Jack Frost's microwavable gel packs were on sale more than one year before its patent application was filed, and, therefore, I conclude that its patents are invalid under 35 U.S.C. § 102(b).

*Inequitable Conduct*

■ A patent may be rendered unenforceable for inequitable conduct if the patentee, with intent to deceive, failed to disclose material information, or submitted false material information, in its patent application. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed.Cir. 1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Materiality and intent must be proven by clear and convincing evidence. *Id.*

■ False or omitted information is material if "there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). P & N has proved by clear and convincing evidence that Jack Frost failed to disclose material information. The evidence presented at trial can lead to only two conclusions—either the packs sold by Jack Frost to Carolon in May of 1984 were made of nylon polyethylene or they were made of high density polyethylene. Under either conclusion, Jack Frost omitted material information from its patent application. If the packs were made of nylon polyethylene, then Jack Frost failed to disclose that the product in the patent application had been on sale for more than one year before the filing of the application. If the packs were made of high density polyethylene, then Jack Frost failed to disclose the microwavability of high density polyethylene as prior art. Both of these omissions are material under the standard set out in *J.P. Stevens*.

■ P & N is faced with a more difficult task in proving intent to deceive. "Direct proof of wrongful intent is rarely available

but may be inferred from clear and convincing evidence of the surrounding circumstances." *LaBounty Mfg. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992). In this case, Jack Frost's intent to deceive the Patent Office may be inferred from the facts proved at trial. Mr. Francis withheld highly relevant information from the Patent Office. Under either scenario—that· is, whether the packs sold to Carolon in May of 1984 were made of nylon polyethylene or high density polyethylene—Mr. Francis would have known that the information withheld would reduce his chances of obtaining a patent. If the packs were made of nylon polyethylene, then Mr. Francis would have known that he had sold such packs more than a year before he filed for the patent application. If the packs were made of high density polyethylene, then Mr. Francis either misrepresented his test results on "polyethylene" packs in the patent application,[3] or failed to disclose the Reids' results on high density polyethylene packs. If Mr. Francis had disclosed that on May 9, 1984 he had sold packs made of the same material as that claimed in the patent or made of another material that performed the same function as the material claimed in the patent, the Patent Office would not have issued the patent.

Plaintiff did not present any evidence that the omission was simply an oversight. Additionally, Mr. Francis' lack of candor and extraordinary willingness to depart from prior deposition testimony in this trial bolsters the conclusion that he intended to deceive the Patent Office when applying for his patent. Based on all of the evidence presented at trial, I find that it is "highly probable" that Mr. Francis intended to deceive the Patent Office in failing to disclose material information. *See Gardiner v. Gendel,* 727 F.Supp. 799 (E.D.N.Y.1989) (finding intent to mislead the Patent Office where plaintiffs failed to disclose their ·own sale of nearly identical design more than one year before filing of patent application, did not offer evidence that failure to disclose was an honest mistake, and

offered testimony that was "less than truthful"), *aff'd,* 976 F.2d 746 (Fed.Cir.1992).

 When a court finds that inequitable conduct has occurred with respect to one or more claims during prosecution of the patent application, the entire patent is unenforceable. *Kingsdown,* 863 F.2d at 877. Additionally, since the '964 patent is a continuation of the '311 patent, a finding of inequitable conduct with respect to the '311 patent application will render the '964 unenforceable as well. *See Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.,* 910 F.2d 804, 809–12 (Fed.Cir.1990). Therefore, the product and process claims in both the '311 and the '964 patents are unenforceable.

### Conclusion

For the foregoing reasons, Jack Frost's patent infringement suit against P & N is dismissed with prejudice.

SO ORDERED.

---

3. The patent application refers to tests done on "polyethylene"—it does not state whether the film was high density or low density polyethylene. At trial, Mr. Francis testified that he did not know whether the polyethylene referred to in

the application was high density or low density. (Tr. at 244.) Yet, he testified that he wrote a letter to the Reids stating that the packs he sent in May of 1984 were made of high density polyethylene. (Tr. at 317–19.)