### SEMICONDUCTOR ENERGY LABORATORY CO., LTD., Plaintiff,

v.

### SAMSUNG ELECTRONICS CO., LTD., Samsung Electronics America, Inc., and Samsung Semiconductor, Inc., Defendants.

C.A. No. 96–1460–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 15, 1998.

Gregory L. Murphy, F. Allen Phaup, II, Murphy Morris & Mitchell, Alexandria, VA,

of counsel, Frederick Brown, Lawrence B. Goodwin, Robert A. Cote, Orrick, Herrington & Sutcliffe L.L.P., New York City, for plaintiff.

Cecelia H. Gonzalez, Basil C. Culyba, Thomas E. Gilbertsen, William D. Belanger, Howrey & Simon, Washington, DC, David J. Healey, Arnold, White & Durkee, Houston, TX, David Berg, Berg & Androphy, Houston, TX, Alan H. MacPherson, Russell L. Johnson, T. Lester Wallace, Fabio E. Marino, Arthur J. Behiel, Skjerven, Morrill, MacPherson, Franklin & Friel, L.L.P., San Jose, CA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this patent infringement action, plaintiff Semiconductor Energy Laboratory Co. ("SEL") alleges that defendants Samsung Electronics, Samsung Electronics America, and Samsung Semiconductor, (collectively "Samsung") made or sold active matrix display units that infringe SEL's U.S. Patent No. 5,543,636 ("the '636 patent"). Among its defenses to SEL's charge of infringement, Samsung alleges that the '636 patent is unenforceable owing to SEL's inequitable conduct before the Patent and Trademark Office ("PTO"). Between March 17, 1998 and April 3, 1998, a seven-day bench trial was held on Samsung's affirmative defense of inequitable conduct, during which time the Court heard fact and expert opinion testimony from several witnesses, admitted into evidence numerous exhibits, and considered the parties' written and oral arguments. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law, as announced from the bench pursuant to Fed.R.Civ.P. 52(a). But, to begin with and before listing the detailed findings and conclusions, it is useful as context to describe briefly the parties, the pertinent patents, and the general law of inequitable conduct. Indeed, the settled legal principles of the doctrine of inequitable conduct are the lens through which the factual record must be examined and weighed.

### I.

SEL is a Japanese research and development company that specializes in semiconductor technology. Over the past eighteen years, SEL has filed over 5,000 patent applications worldwide, and has been awarded approximately 1,500 U.S. and foreign patents for its inventions. Dr. Shunpei Yamazaki, the president and majority shareholder of SEL, is the inventor or co-inventor on most of SEL's patents, including the '636 patent.

SEL filed its application for the '636 patent, titled "Insulated Gate Field Effect Transistor," on June 7, 1995, and the patent issued on August 6, 1996. SEL is the owner of the '636 patent. The asserted claims of the '636 patent (claims 1–3 and 5) are generally directed to a thin film transistor ("TFT"), a type of insulated gate field effect transistor ("IGFET") used in active matrix display units. Active matrix displays, which are commonly used as screens in laptop computers, have thousands of pixels that create a picture or image. The pixels are turned on and off by TFT's. The invention claimed in the '636 patent is a TFT with a semiconductor layer made of intrinsic amorphous silicon having a channel region sandwiched between a silicon nitride gate insulator and another insulator, wherein the concentration of impurities (e.g., carbon and oxygen) in the channel region are $5 \times 10^{18}$ atoms/cm$^3$ or less. It is the combination of the specific structure together with the low impurity levels that constitutes the invention.

In October 1996, SEL brought this infringement action against the Samsung defendants, a group of companies engaged, inter alia, in the manufacture and sale of active matrix displays as well as laptop computers containing active matrix displays. Specifically, SEL's complaint alleges that the active matrix display units made and sold by Samsung infringe the '636 patent. Initially, SEL's complaint also included claims for infringement of U.S. Patent Nos. 5, 349, 204 ("the '204 patent") and 5,521,400 ("the '400 patent"). However, on March 4, 1998, an agreed order was entered withdrawing the '204 and the '400 patents from the action, thereby leaving the '636 patent as the sole remaining patent-in-suit.

Samsung alleges, as an affirmative defense, that the '636 patent is unenforceable owing to SEL's inequitable conduct before the PTO in connection with three separate patent applications: (i) the application for the '636 patent itself; (ii) the application for U.S. Patent No. 5,315,132 ("the '132 patent"); and (iii) the application for the '204 patent.

The relationship of these patents to each other is pertinent to the disposition of the issue at bar. In this regard, the genealogy of the '636 and '132 patents is well illustrated in SEL's Exhibit No. 432, which is attached to this Memorandum Opinion as an appendix. In essence, the '132 patent is antecedent to, in the direct priority chain of the '636 patent. Specifically, the '636 patent resulted from continuation and divisional applications from the application that issued as the '132 patent. The priority date of the '636 patent thus relies on the chain of applications that includes the '132 patent. Further, because the subject matter of the '636 patent is so closely related to the '132 patent, a terminal disclaimer was filed with respect to the '636 patent, giving it the expiration date of the '132 patent.[1] Both the '132 and the '636 patents rely upon the May 18, 1984 filing date for SEL's Japanese laid-open Application No. 59–100250 ("the '250 application"), which has a "one-to-one" relationship with both the '132 and the '636 patents. Both patents have the same inventor (Dr. Yamazaki), owner (SEL), disclosure, specification, and title. The '132 patent issued on May 24, 1994, resulting from an application that was filed on December 8, 1992.

The '204 patent is not a part of the '250 application–'132–'636 chain. Yet, like the '636 patent, the '204 patent claims an invention related to low levels of impurities, contains similar prior art references, and was prosecuted at roughly the same time as the '636 patent. Specifically, the '204 patent

issued on September 20, 1994, based on an application filed on December 7, 1993.

In support of its inequitable conduct defense, Samsung alleges that SEL made deliberate, material misrepresentations to, and withheld material prior art references from, the PTO during its prosecutions of these three applications. The specifics of these allegations for each patent are set forth as a preface to the findings for that patent. In essence, Samsung argues that SEL's misconduct during each of these three patent prosecutions is sufficient to render all of the claims of the '636 patent unenforceable for the life of the patent.

## II.

█ It is fundamental that all applicants for patents have a duty to prosecute patent applications in the PTO with candor, good faith, and honesty. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The vital importance of this duty cannot be overstated. Without it, the edifice of patent law cannot stand. Indeed, the cornerstone presumption of an issued patent's validity, and the placement of a heavy burden on the infringer to show invalidity, both rest on the proper fulfillment of this duty.

█ A breach of this duty of candor, good faith, and honesty constitutes inequitable conduct,[2] and renders all claims of the patent involved unenforceable. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995). And inequitable conduct includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Id.* The party raising the affirmative defense of inequitable conduct must offer

---

1. In this regard, the '132 patent also claims a TFT with the same low levels of impurities as are claimed in the '636 patent. As Dr. Yamazaki testified during the hearing, the "essential nature of the ['636 & '132] invention[s]" is the same. The difference between the two patents is that the asserted claims of the '636 patent are narrower than the claims of the '132 patent. For example, the '132 patent is not limited to an IGFET with a *silicon nitride* gate, or an *intrinsic*

silicon layer, while the claims of the '636 patent are so limited.

2. Inequitable conduct is simply "the unclean hands doctrine applied to particular conduct before the PTO." *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed.Cir. 1990).

clear and convincing evidence that the conduct is both material and intended. *See id.*[3] More specifically, the doctrine of inequitable conduct requires the trial court to undertake a two-step analysis. *See Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed.Cir.1991). First, the court must discern whether the withheld references or misrepresentations satisfy a threshold level of materiality. *See id.* The court must also determine whether the applicant's conduct in this regard satisfies a threshold showing of intent to mislead. *See id.*[4] Next, assuming satisfaction of the thresholds, "the trial court must balance materiality and intent. . . . The more material the omission [or misrepresentation], the less culpable the intent required, and vice versa." *Id.* Finally, an equitable judgment must be made that, "in light of all

the particular circumstances, the conduct of the patentee is so culpable that its patent should not be enforced." *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1070 (Fed.Cir.1992).

Materiality is defined at 37 C.F.R. § 1.56 (Rule 56), and, as the Federal Circuit teaches,[5] this is the starting point in the materiality analysis. Thus, since 1992,[6] Rule 56 has provided, in pertinent part, as follows:

> information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
>> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; [7] or

3. Clear and convincing evidence is evidence "which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions [is] "highly probable." ' " *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

4. It is worth noting that a finding of gross negligence itself is insufficient to satisfy the intent threshold. *See Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir. 1988). At the same time however, the precise content of the intent "threshold" remains essentially undefined. In any event, the defense of inequitable conduct will not succeed in rendering a patent unenforceable unless it is shown by clear and convincing evidence that the offending conduct was material and done with an intent to deceive.

5. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed.Cir.1997).

6. Prior to the 1992 amendment, Rule 56 defined information as material when "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56 (1989). The Federal Circuit has not discussed the meaning of the new Rule 56, which appears narrower, *i.e.*, less information is defined as material, than the former version of Rule 56. Nevertheless, the new (1992) version of Rule 56 does not purport to alter the previously-settled principle that a "but for" test is inappropriate in determinations of materiality. *See Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed.Cir.1989) (rejecting a "but for" standard of materiality under pre–1992 Rule 56). In other words, materiality does not

require a finding that "but for" the inequitable conduct, the patent would not have issued.

Also worth noting is that the new version of Rule 56 does not refer to a hypothetical reasonable examiner or to any standard for an examiner's competence. Application of the new rule does not require the use of any such standard. In any event, it is clear that patent examiners are not presumed to be omniscient, *i.e.*, to know all the prior art, together with its relevance and significance. Were this not so, there would be no need for a duty of disclosure of prior art. But this duty is vital given that patent prosecution proceedings are typically ex parte, and examiners, while technically skilled, are not omniscient. Consistent with this, examiners are properly characterized as "quasi-judicial officials trained in the law and presumed to 'have some expertise in interpreting the [prior art] references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.' " *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed.Cir.1995) (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed.Cir.1984)). Thus, examiners are skilled in the art insofar as they are technically competent to understand information and references in some technical or scientific field, but they are not of ordinary skill in the art to the extent that this might imply that they are aware of all the pertinent prior art.

7. Rule 56 further provides that "[a] prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to estab-

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

Thus, under the new Rule 56, materiality is phrased in terms of whether a misrepresentation, if corrected, or an omitted reference, if disclosed, would, itself or together with other information, give rise to a *prima facie* (*i.e.*, rebuttable) case of unpatentability. If so, the omitted reference or misrepresentation is material. But this is not the only test of materiality. The omitted reference or misrepresentation may also be material if it refutes or is inconsistent with the applicant's patentability arguments.

■ Whether a withheld reference or omitted information is cumulative plays a prominent role in this case. Thus, it is important to note that while cumulative information is not material under Rule 56, a withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references. *See, e.g., Molins,* 48 F.3d at 1180; *LaBounty,* 958 F.2d at 1075–76; *In re Jerabek,* 789 F.2d 886, 890 (Fed.Cir.1986). Thus, where, as here, the invention is a combination of elements, an undisclosed prior art reference that contains more of the combined elements than the disclosed references is not cumulative simply because various elements of the invention appear in other disclosed references.

■ Inequitable conduct requires more than mere materiality of the withheld or misrepresented reference or information; it also requires an intent to act inequitably. And no presumption of intent to deceive arises merely from the materiality of an undisclosed reference. *See Halliburton,* 925 F.2d 1435, 1442. Even gross negligence "does not of itself justify an inference of intent to deceive." *Id.* Rather, such conduct "can support an inference of intent only when, 'viewed in light of all the evidence, including evidence indicative of good faith,'

the conduct is culpable enough 'to require a finding of intent to deceive.'" *Id.* (quoting *Kingsdown,* 863 F.2d at 876). Yet, it is also true that a patentee facing a "high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead." *Critikon,* 120 F.3d at 1257. In such circumstances, a "mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice." *Id.*

The test, then, requires a consideration of, and a judgment on, the totality of the circumstances. In the words of the Federal Circuit, courts must determine whether the conduct "in its totality manifests a sufficiently culpable state of mind to warrant a determination that it was inequitable." *Molins,* 48 F.3d at 1181. This sensible formulation recognizes that direct proof of intent is rarely available and that it is impossible to scrutinize directly the workings of the human mind.

It is against these general legal principles that Samsung's claims of inequitable conduct must be assessed. Thus, analysis of Samsung's claims will proceed by an initial assessment as to the materiality of any withheld or mischaracterized information during SEL's prosecution of the '636, '132, and '204 patent applications. An assessment of SEL's intent will follow.

## III.

### A. The '636 Patent Application

■ Samsung alleges two specific instances of inequitable conduct by SEL during its prosecution of the '636 patent. First, SEL submitted to the PTO as prior art the Japanese laid-open Application No. 56–135968, assigned to Cannon K.K. ("the Canon '968 application"), which is also directed to TFT's. Specifically, SEL submitted the full 29–page Japanese language version and a one-page partial English translation of the Canon '968 application. Samsung contends that by highlighting, through translation, only one of the many elements in the Canon

lish a contrary conclusion of patentability." 37 C.F.R. § 1.56(b).

reference that was relevant to the '636 application, and by leaving the others untranslated, SEL deliberately mischaracterized the importance of Canon and attempted to conceal material information from the examiner. Second, SEL also revealed as prior art a 1983 article by Dr. C.C. Tsai titled "Amorphous Si Prepared in a UHV Plasma Deposition System," which teaches the reduction of impurities in amorphous silicon to improve performance in electronic devices. SEL distinguished the Tsai article before the PTO by claiming that it applied primarily to solar cells and not TFT's, and by stating that the current in the devices discussed in the article runs in a perpendicular direction, while the current in the type of TFT's referred to in the '636 patent runs in a parallel direction. Samsung alleges that SEL's statements in this regard were disingenuous attempts to distinguish the Tsai article from the '636 patent application, and that they were contrary to its own knowledge and inconsistent with its own position in other patent applications.

### 1. The Canon '968 Application

On November 15, 1995, in connection with its '636 patent application, SEL disclosed approximately 90 references of prior art to the PTO, including the Canon '968 application. SEL submitted the full 29–page Japanese language version of the Canon '968 application to the PTO, but not a full English translation. Instead, it submitted a one-page document titled "Partial Translation of JP–Laid Open 56–135968," which selectively translated for the PTO sections of the application appearing both before and after the untranslated portions of the Canon '968 application. Dr. Yamazaki testified that the partial translation had already been prepared in connection with another patent application, and that he made the decision that only certain portions of the Canon '968 application should be translated and submitted to the

PTO together with the full Japanese language version in connection with the '636 application.

The partially translated portion of the Canon reference discloses a silicon nitride gate insulator, one of the elements of the asserted claims of the '636 patent. Dr. Yamazaki testified that at the time he submitted the partially translated Canon '968 reference, the silicon nitride gate insulator was the only disclosure in the Canon '968 application that he believed to be relevant to the '636 patent. Indeed, when he disclosed the Canon '968 application to the PTO, he identified its relevance only as "disclos[ing] the use of silicon nitride for a gate insulating layer of a thin film transistor."

Yet, this was not accurate; the untranslated portions of the Canon '968 application were also relevant to a consideration of the patentability of the invention claimed in the '636 patent. In general, these portions were (a) the frequent admonitions to prevent or limit atmospheric impurities in semiconductor materials,[8] which provide an express suggestion to employ teachings such as those found in the Tsai article or in the '423 or the '488 applications [9] to reduce carbon, oxygen and nitrogen impurities below the levels claimed in the '636 patent, and (b) a description of the same structure for a thin film transistor as is described in the '636 patent. More specifically, the untranslated portion of the Canon '968 teaches avoiding exposure of the channel region to impurities resulting from air or oxygen. Further, the untranslated portion teaches the cleaning of the substrate by etching part of it away, prior to depositing the amorphous silicon. Further, it teaches that the substrate can introduce impurities, and that washing alone is insufficient to avoid impurities. Although other prior art disclosed by SEL during the prosecution of the '636 patent, such as the Tsai article,[10] teach avoidance of impurities, none

---

**8.** In this regard, and indeed generally, the Court credits the testimony of Samsung's witnesses Dr. Fonash, Dr. Tsai, and Dr. Meyerson over SEL's witnesses Dr. Lucovsky and Dr. Yamazaki whenever there is a conflict.

**9.** That is, SEL's Japanese laid-open Application Nos. 59–35423 ("the 423 application") and 59–

35488 ("the '488 application"), which were laid-open (published in Japan) on February 27, 1984.

**10.** Findings relating both to the nature of the Tsai article and to Dr. Yamazaki's and SEL's knowledge of it are set forth in the following sections.

disclose or teach the processing sequences useful in avoiding impurities, such as etching the substrate. The translated portion of the Canon '968 application submitted by SEL to the PTO omitted this teaching.

It is also significant that the translated portion of the Canon '968 application describes a TFT structure that is somewhat different from that described in the '636 patent, whereas the structure described in the untranslated portion of the Canon '968 application describes the same structure found in the '636 patent. Thus, the structure described in the untranslated portion of the Canon '968 application has the same intrinsic semiconductor layer made from amorphous silicon; the same channel region sandwiched between the insulators; and (in both the translated and the untranslated portions), the same silicon nitride gate insulator as claimed in the '636 patent. To be sure, other references cited to the PTO disclose the various elements described in the '636 patent claims. Yet, no other reference before the examiner contained as complete a combination of the '636 elements as is disclosed in the untranslated Canon '968 application.

Thus, contrary to SEL's contention, Dr. Fonash's testimony convincingly establishes that the untranslated portions of Canon are not merely cumulative, as they contain a more complete combination of the elements—the intrinsic amorphous silicon, the silicon nitride gate insulator, and the admonition to avoid impurities—that are claimed in the '636 patent itself.[11] Dr. Fonash further convincingly testified that the untranslated portions of the Canon '968 application and the Tsai article, taken together, would disclose a device having every element of the asserted claims of the '636 patent. As Dr. Fonash put it, a fully translated Canon '968 application provides a "good blueprint" for making the exact device described in the '636 patent, and additionally provides the admonition to avoid impurities. The Tsai article, discussed *infra* in more detail, discussed amorphous silicon films with specific low levels of impurities within the claim limitations of the '636 patent. Thus, Dr. Fonash concluded that the fully translated Canon '968 application, when taken together with the Tsai article, renders obvious the asserted claims of the '636 patent. Moreover, he concluded that failing to disclose the untranslated portions of the Canon application would significantly hinder a patent examiner's ability to determine whether the '636 patent application was an unobvious advancement over the prior art. In a grudging admission of this, Dr. Yamazaki testified during the inequitable conduct hearing that submitting a complete translation of the Canon '968 application would have been a "kinder thing" for him to do, and that a full translation "would be more convenient" for the PTO.

Accordingly, the evidence is clear and convincing that untranslated portions of the Canon '968 application contained information highly material to the prosecution of the '636 patent application as they, together with other information, establish a *prima facie* case of unpatentability. See 37 C.F.R. § 1.56. The evidence is also clear and convincing that the fully translated Canon '968 application was knowingly withheld from the PTO.

### 2. The Tsai Article

In the course of prosecuting the application that led to the issuance of the '636 patent, SEL disclosed to the PTO as prior art a 1983 article by Dr. Tsai titled "Amorphous Si Prepared in a UHV Plasma Deposition System." This article teaches the reduction of impurities in amorphous silicon to improve performance in electronic devices.

During the prosecution of the '636 patent application, SEL sought to distinguish the Tsai article before the PTO by suggesting that it applied primarily to solar cells rather than to TFT's. Further, SEL argued before the PTO that the Tsai article was distinguishable in that the electrical current in the devices discussed in her article runs in a perpendicular direction, while the electrical current in the TFT's referred to in the '636 patent runs in a parallel direction. At the inequitable conduct hearing, SEL, through the testimony of Dr. Yamazaki, expressed the view that impurities such as carbon and

---

11. Worth noting in this regard is that Dr. Yamazaki acknowledged his duty to provide the PTO with the prior art references "most similar to" his claimed invention.

oxygen affect solar cells differently from TFT's and create different problems in the two devices. Thus, SEL asserted both before the PTO and in the course of this hearing, that teachings concerning the effects of impurities in solar cells are not relevant to TFT's.

The record as a whole discloses that SEL's efforts to distinguish the Tsai article before the PTO were neither valid nor accurate. Thus, Dr. Tsai testified convincingly that her article, which refers to "large area devices," would have been understood by those in the field, both at the time of its publication and thereafter, to include devices made with TFT's as well as solar cells. Dr. Fonash agreed, testifying that in 1983, at the time the Tsai article was published, he understood the term "large area device" to include devices made with TFT's. Dr. Yamazaki also testified that the current active matrix display units that utilize TFT's are large area devices. In sum, the expert testimony convincingly establishes that contrary to SEL's representation to the PTO, the Tsai article would have been understood by persons of ordinary skill in the art in 1983 and thereafter to apply not just to solar cells, but to TFT's as well.

Record evidence reflects that Dr. Yamazaki, a distinguished and accomplished solid state physicist, surely knew this. Thus, his '423 and '488 Japanese laid-open applications, which deal mainly with solar cells, expressly state that the benefits of the lower levels of impurities described in those applications also apply to "insulated gate field effect semiconductor device[s]" such · as TFT's. So, as the '423 and the '488 laid-open applications reflect, Dr. Yamazaki recognized by 1984 a clear connection between solar cells and TFT's in that the importance of reducing impurity levels is applicable to both. Moreover, SEL was prosecuting the '400 patent application, one of the original patents-in-suit, at approximately the same time it was prosecuting the '636 patent application. The '400 patent, which is also directed mainly to solar cells, contains a figure (figure 9) that illustrates that the invention applies to insulated gate field effect transistors, as well.

In summary, for the limited purpose of trying to persuade the examiner that the Tsai article was not material, SEL adopted a position contrary to its own knowledge, and inconsistent with its own previously stated position on an important issue before the PTO. Specifically, in its '423, '488, and '400 patent applications, SEL asserts that its claimed inventions, which are primarily directed to reducing impurities in solar cells, are equally applicable to TFT's. Yet, in its prosecution of the '636 patent application, SEL distinguished the Tsai article on the basis that its teachings apply primarily to solar cells, not TFT's. Thus, contrary to the clear statements found in the '423, '488, and '400 applications, SEL argued before the PTO, in effect, that references concerned with the effects of impurities in solar cells are not germane to a TFT's patentability. SEL never revealed this inconsistency to the PTO as required under 37 C.F.R. § 1.56.

Next, convincing expert testimony also contradicts SEL's representation to the PTO that the Tsai article is distinguishable based on the direction of the current. Thus, Dr. Tsai and Dr. Fonash persuasively testified that it is irrelevant to the effect of impurities in a device as to whether current runs perpendicular or parallel. Accordingly, it is clear from this record that the difference in the direction of current flow was not a valid basis for distinguishing the Tsai article from the '636 patent application. Moreover, Dr. Yamazaki, as an accomplished solid state physicist, was certainly aware that this was a distinction without significance as well.

Knowledge that the teachings of the Tsai article were equally applicable to TFT's was material to the prosecution of the '636 patent application. The expert testimony of Dr. Fonash clearly established that the Tsai article teaches the making of amorphous silicon with impurity concentrations in the amorphous silicon layer within the levels recited in all claims of the '636 patent. The deposition testimony of Dr. Lucovsky confirms this conclusion. Further, as the testimony of Dr. Fonash convincingly establishes, the Tsai article, taken together with the untranslated portions of the Canon '968 application, disclose a device having every element of the

asserted claims of the '636 patent.[12] Thus, the clear and convincing evidence demonstrates that the Tsai article, taken together with other information, would give rise to a *prima facie* case of unpatentability, and was therefore highly material to the prosecution of the '636 patent application. Equally clear and convincing is that SEL knowingly mischaracterized the article as not relevant to TFT's, the subject matter of the '636 invention.

### B. The '132 Application

Samsung asserts that during the prosecution of the '132 patent application, SEL made a material misrepresentation regarding information disclosed in a prior art reference, and additionally failed to disclose at least three material prior art references. Specifically, SEL represented to the PTO that the levels of impurities recited in a prior art reference, U.S. patent No. 4,766,477 issued to Nakagawa ("the Nakagawa '477 patent"), was $4 \times 10^{19}$ atoms/cm$^3$ when the correct value was approximately eight times lower. Samsung alleges that SEL deliberately misrepresented the figure in order to distinguish the '636 patent from the Nakagawa '477 patent. Further, Samsung contends that SEL deliberately withheld at least three material prior art

references, namely (1) the 1983 Tsai article "Amorphous Si Prepared in a UHV Plasma Deposition System," (2) the '423 laid-open application, and (3) the '488 laid-open application.

A threshold issue is the relevance of any inequitable conduct by SEL in connection with its prosecution of the '132 patent application. Samsung contends that where inequitable conduct is found in an application that results in an issued patent, all subsequent patents relying on the same chain of priority, whether from divisional or continuation applications, must also be held unenforceable, whether or not the applicant's inequitable conduct continued during the subsequent application. Thus, Samsung invites the Court to hold that inequitable conduct during SEL's prosecution of the '132 patent application necessarily renders unenforceable all the claims of the '636 patent.

■ This argument requires an extension of existing law. To date, no Federal Circuit case has squarely decided this issue, although there is supporting Federal Circuit dictum,[13] and supporting district court case law,[14] upon which Samsung relies. In the

---

12. The Tsai article's materiality to the '636 patent is confirmed by Dr. Yamazaki's own January 1995 letter to his licensing agent, in which he acknowledges the Tsai article as being highly relevant to the '132 patent, which, like the '636 patent, is directed to TFT's, not solar cells.

13. *See Fox Indus., Inc. v. Structural Preservation Sys.*, 922 F.2d 801, 804 (Fed.Cir.1990) (stating that inequitable conduct "early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application"); *see also Consolidated Aluminum*, 910 F.2d at 810–11 (inequitable conduct in procuring one patent-in-suit may render related patents-in-suit unenforceable where the inequitable conduct has an "immediate and necessary relation" to the equity patentee seeks, namely enforcement of the related patents).

14. *See Baxter Int'l. Inc. v. McGaw, Inc.*, 958 F.Supp. 1313, 1315–17 (N.D.Ill.1997) (Inequitable conduct in original application which gave rise to multiple divisional applications resulted in all three resulting patents being held unenforceable, even when inequitable conduct did not affect the claims of one of the resulting patents); *Jack Frost Lab., Inc. v. Physicians & Nurses Mfg. Corp.*, 901 F.Supp. 718, 729 (S.D.N.Y.1995) (Inequitable conduct in original application that re-

sulted in issued patent also made later patent resulting from continuation application unenforceable); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 837 F.Supp. 1444, 1478 (N.D.Ind.1992) (Inequitable conduct in prosecution of original application that resulted in issued patent could not be purged in continuation application, and therefore, subsequent patent in the same chain held unenforceable); *Molins PLC v. Textron, Inc.*, 821 F.Supp. 1551, 1581 (D.Del.1992) *aff'd*, 48 F.3d 1172, 1187 (Fed.Cir. 1995) (Inequitable conduct in original application that resulted in an issued patent likewise rendered later patent issued from a divisional application unenforceable); *East Chicago Mach. Tool Corp. v. Stone Container Corp.*, 181 U.S.P.Q. 744, 748 (N.D.Ill.1974), *vacated in part*, 185 U.S.P.Q. 210 (N.D.Ill.1974) (Where inequitable conduct was committed in the original application, all patents stemming from it, whether resulting from continuation or divisional applications, are unenforceable for inequitable conduct regardless of whether the inequitable conduct relates to any of the issued claims in the subsequent patents).

Closely read, none of these cases is precisely on point factually; none involves, as here, misrepresentations or nondisclosure made with respect to an earlier patent in a chain, but not

final analysis, however, this issue need not be reached, as SEL's inequitable conduct during its prosecution of the '636 patent application is sufficient to render the claims of the '636 patent unenforceable. Nevertheless, given the close relationship between the '636 and the '132 patents,[15] any inequitable conduct by SEL during its prosecution of the '132 is still relevant to show plan, motive, intent and pattern and practice under Rules 402, 403, & 404(b), Fed.R.Evid.[16]

### 1. The Nakagawa '477 Patent

During SEL's prosecution of the '132 patent application, the PTO originally rejected some of its claims relating to low levels of impurities based on the same or similar impurity levels described in the Nakagawa '477 application. In response, SEL, in an amendment filed on May 25, 1993, argued that the rejected '132 claims should be allowed over the Nakagawa application because the '132 claimed a lower level of impurities. To prove this vital point, the amendment submitted to the PTO included a calculation premised on an incorrect, overstated figure for the atomic density of amorphous silicon. Specifically, the figure used was $4 \times 10^{23}$ atoms/cm$^3$, which was approximately eight times higher than the correct value of $5 \times 10^{22}$ atoms/cm$^3$. The result of using this artificially inflated figure was that SEL's calculation of the level of impurities disclosed in the Nakagawa '477 patent, $4 \times 10^{19}$ atoms/cm$^3$, was also approximately eight times higher than the figure actually disclosed in the Nakagawa '477 patent. Thus, the impurities range claimed in the '132 patent, namely $5 \times 10^{18}$ atoms/cm$^3$ or less, appeared lower than that disclosed and claimed in the Nakagawa '477 patent. On this basis, the examiner allowed the previously rejected claims in the '132 patent over the Nakagawa reference.

Dr. Yamazaki testified that the incorrect silicon atomic density figure provided to the PTO was the result of a careless error by Mr. Kunitaka Yamamoto, SEL's in-house patent representative who was assisting Dr. Yamazaki with the '132 prosecution. Mr. Yamamoto confirmed in his testimony that he had made the error. Yet, no satisfactory explanation was provided by Mr. Yamamoto as to how he arrived at this incorrect figure,

---

repeated in connection with the later, challenged patent in the chain. Instead, the cited cases generally involve misconduct with respect to an earlier patent that is repeated and hence permeates, in a sense, the prosecution of the later, related patent. *See, e.g., Jack Frost,* 901 F.Supp. at 718; *Golden Valley,* 837 F.Supp. at 1444; *but cf. Baxter,* 958 F.Supp. at 1315–1318 (inequitable conduct committed during original application not repeated during prosecution of subsequent, divisional application).

**15.** Again, the '636 patent resulted from continuation and divisional applications from the application that issued as the '132 patent. See appendix. Because the subject matter of the two patents is so closely related, a terminal disclaimer was filed, giving the '636 patent the expiration date of the '132 patent.

**16.** It is worth emphasizing the distinction drawn here between relying on inequitable conduct relating to the '132 patent as an independent basis for holding the '636 patent unenforceable, which is not the course followed here, and relying on inequitable conduct relating to the '132 patent as evidence that may aid in the determination of SEL's intent with respect to conduct relating to the prosecution of the '636 patent application. The latter course is followed here. In other words, this Memorandum Opinion proceeds on the basis that conduct related to the prosecution of the '636 is the sole basis for a finding of inequitable conduct, but that conduct relating to the '132 is relevant and probative as it provides important context, given the close relation of the patents and as it sheds light on the intent underlying the conduct relating to the prosecution of the '636 patent.

A further digression on this subject is warranted. Although there do not appear to be any Federal Circuit decisions involving or applying Rule 404(b), Fed.R.Evid., there can be little doubt that it is as applicable in patent litigation as in other litigation contexts. *See Arcade, Inc. v. Minnesota Mining and Mfg. Co.,* 24 U.S.P.Q.2d 1578, 1589 (E.D.Tenn.1991) (finding prior inequitable conduct to be 404(b) evidence from which to infer intent to deceive during later patent prosecutions). Yet, because the inequitable conduct defense is so often frivolously pled, *see Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422 (Fed.Cir.1988) (characterizing the practice of charging inequitable conduct in almost every patent case as "an absolute plague"), district courts must take care to ensure that assertions of the defense of inequitable conduct plus reliance on Rule 404(b) do not become a license for a fishing expedition into a patentee's files concerning related patents and applications. Discovery of such files should not be allowed absent a significant threshold showing of inequitable conduct and relevance with respect to the patent-in-suit.

or why he was able to provide the correct atomic density figure for silicon in later applications.[17] Mr. Yamamoto merely testified that the mistake occurred because his "memory of the number of [silicon] atoms was incorrect."

Dr. Yamazaki gave conflicting testimony on precisely how he learned of the error. At one point during the hearing, Dr. Yamazaki testified that I.B.M. had pointed out the mistake sometime following a March 1995 licensing meeting. Later, Dr. Yamazaki testified that I.B.M. had not revealed the mistake, but rather that he had discovered the error while preparing for this lawsuit. In any event, it is clear that neither Dr. Yamazaki nor Mr. Yamamoto informed the PTO that an error had been made regarding the silicon density figure provided in connection with the prosecution of the '132 patent. Specifically, Dr. Yamazaki testified that he did not disclose the error when it came to his attention because the '132 patent had already issued. Rather, he thought that it was sufficient that the correct figure had been submitted in connection with SEL's pending prosecution

of the '636 patent application.[18] Mr. Yamamoto also testified that he did not think that he had any obligation to inform the PTO that an error had been made during the prosecution of the then issued '132 patent.[19]

The expert testimony of Dr. Fonash established by clear and convincing evidence that disclosure of the correct figure for the density of silicon was highly material to the prosecution of the '132 patent application. Specifically, the PTO originally rejected claims in the '132 patent application based in part on the impurity concentrations disclosed in the Nakagawa '477 application. Yet, as Dr. Fonash testified, the use of an overstated silicon atomic density figure enabled SEL to argue that the '132 patent application claimed a lower level of impurities than the Nakagawa '477 application. Disclosure of the correct silicon atomic density figure, then, would have deprived SEL of this important argument in support of patentability.

## 2. The Tsai Article[20]

On August 26, 1983, Dr. Yamazaki attended a lecture given by Dr. C.C. Tsai at a

---

**17.** Specifically, SEL used the correct atomic density figure for amorphous silicon in an April 1995 filing to the PTO in connection with the '636 proceeding, and again later in the same proceeding in a November 15, 1995 filing.

**18.** On this point, it is worth noting that Mr. Yamamoto testified that Dr. Yamazaki suggested calling the error to the PTO's attention, but that he, Mr. Yamamoto, essentially vetoed this suggestion. This testimony is flatly implausible; the record leaves no doubt that Dr. Yamazaki pays close attention to matters of this sort, and that in all matters relating to his patent applications, Dr. Yamazaki ultimately calls the shots. This fact is made pellucidly clear by Samsung's Exhibit No. 1417, a January 1996 letter from Dr. Yamazaki to his licensing agent explaining Dr. Yamazaki's decision to revoke a power of attorney in connection with the prosecution of Application No. 425,455, an application in the '250 application—'132–'636 chain. See appendix. There, Dr. Yamazaki writes:

The Revocation was necessary because our view regarding certain prior art references was entirely different from Mr. Ferguson's [SEL's patent attorney] view. That is, after we received a Notice of Allowance, Mr. Ferguson suggested that it was necessary to submit the references to the Patent Office as a duty of disclosure. To do this, a Rule 62 continuation application was necessary. However, contrary to Mr. Ferguson, it was our belief that these

references were not more material than the references cited during the prosecution. We and Mr. Ferguson extensively discussed this matter but could not finally reach a conclusion. Mr. Ferguson suggested that even though we (SEL) believed that these references were immaterial, he himself had an obligation to disclose the references as a patent attorney since he believed the references were more relevant than the prior art considered by examiners. In view of the above situation, we decided to file the Revocation of Power of Attorney in order to allow the application to issue as a patent.

There is no doubt, then, that it is Dr. Yamazaki who ultimately determines what information is disclosed to the PTO in connection with his patent applications.

**19.** In this regard, Mr. Yamamoto testified that he had read pertinent portions of the Code of Federal regulations and the PTO's Manual of Patent Examining Procedure and understood his duty of candor to the PTO. More specifically, he confirmed his understanding of the duty of candor as encompassing a duty to disclose to the PTO material information resulting from Japanese patent proceedings, including any material prior art or information cited or brought to his attention in any related foreign application.

**20.** This is the same article that SEL mischaracterized as limited to solar cells in connection

technical conference in Tokyo. The lecture dealt with depositing amorphous silicon films with specific low levels of impurities. Significantly, these low impurity levels also fall within the claim limitations of the '132 and the '636 patents. Dr. Yamazaki testified that his work on lowering impurity levels preceded Dr. Tsai's speech, and that he had given a similar speech concerning his own work in reducing levels of impurities at a Reston, Virginia conference in May 1983. He initially testified that he does not remember being particularly impressed with the Tsai speech, given that it followed his own on reducing impurities.[21] He continued that he did not really recall anything in particular about Dr. Tsai's speech, including whether she discussed specific impurity levels. This testimony was not in accord with his testimony at a February 27, 1998 deposition, at which time he characterized his initial impression of Dr. Tsai's speech as being "spectacular." Other experts, including Dr. Meyerson, confirmed that the Tsai article was a pathbreaking work of great importance.

At the time of the conference, Dr. Yamazaki received an abstract of Dr. Tsai's lecture. Dr. Tsai also testified that she spoke with Dr. Yamazaki following her lecture, and that he asked her for a copy of "Amorphous Si Prepared in a UHV Plasma Deposition System," the article on which her lecture had been based. The Tsai article was in fact published later that year in the Journal of Non–Crystalline Solids, Volume 59 & 60 (1983). Dr. Tsai stated that she directed her secretary to send Dr. Yamazaki a reprint of the article and that it was accordingly sent to him. Further, Dr. Tsai stated that all conference attendees, including Dr. Yamazaki, were sent a copy of all conference papers in a bound volume.

During his first appearance at the hearing, Dr. Yamazaki testified that he did not recall having a conversation with Dr. Tsai, or requesting a copy of her article at the August 1983 conference. Rather, he only remem-

bered speaking to her for the first time, apparently on an unrelated matter, one year later at a conference in Snowbird, Utah. Further, Dr. Yamazaki testified that he did not remember receiving anything other than the abstract of her speech.[22]

In 1984, Dr. Yamazaki and others submitted an article, also to the Journal of Non–Crystalline Solids, which was published later that year. The 1984 Yamazaki article cites to a 1984 article written by Dr. Tsai, which in turn references her 1983 article, "Amorphous Si Prepared in a UHV Plasma Deposition System." Dr. Yamazaki testified that the portion of his 1984 article that refers to the Tsai publication was written by a co-author, and that he in fact never read the Tsai reference.

Given the sequence of events, and the record as a whole, Dr. Yamazaki's testimony on the Tsai article is neither plausible nor credible. It is simply implausible that Dr. Yamazaki did not review and comprehend the significance of the Tsai article in 1983–4 and thereafter. He testified that he delivered a similar speech on lowering impurities just months before he heard Dr. Tsai's own presentation, a presentation Dr. Yamazaki once described as "spectacular," an assessment consistent with Dr. Meyerson's and Dr. Fonash's, but inconsistent with his (Dr. Yamazaki's) own hearing testimony. Further, Dr. Tsai distinctly remembers speaking with Dr. Yamazaki following her presentation, and granting his request for a reprint of her article. And, Dr. Yamazaki's own 1984 article, although a collaborative work, specifically cites to a Tsai article which itself references her 1983 article. Dr. Yamazaki, as an accomplished physicist with a focused interest in this area and as an experienced inventor with a demonstrated interest in securing patents, had every reason to review and remember Dr. Tsai's article.

Yet, the 1983 Tsai article was not disclosed as prior art during the prosecution of

---

with its prosecution of the '636 patent application. *See supra* Part III(A)(2).

**21.** Yet, in a later appearance on the witness stand, Dr. Yamazaki admitted that Dr. Tsai's presentation at the 1983 Tokyo conference "left

an impression" on him because it was a large conference and Dr. Tsai was one of the few women speakers there.

**22.** The abstract alone does not discuss specific impurity levels.

**490**

the '132 patent. Rather, SEL first disclosed the Tsai article to the PTO in November 1994 in connection with Application No. 214,-494 ("the '494 application"), which was soon thereafter abandoned.[23] At that time, SEL represented to the PTO that the Tsai article had only recently come to its attention. Similarly, Dr. Yamazaki testified at the inequitable conduct hearing that the Tsai article was first called to his attention as relevant prior art to the '132 patent during licensing negotiations with Toshiba in October, 1994, after the '132 patent had issued. Yet, as already noted, this is simply not credible; the record as a whole reflects that Dr. Yamazaki was well aware of the Tsai article throughout the relevant period.

As was true in the prosecution of the '636 patent, the Tsai article was highly material to the '132 patent application. In a January 1995 letter to his licensing agent for the '132 patent, Dr. Yamazaki himself stated that "we do not think there is a more relevant reference than C.C. Tsai's abstract of August 22, 1983 and his (sic) papers of December 1983, that you know." Despite the admission, Dr. Yamazaki testified at the hearing that the abstract is not in fact relevant. Yet, any attempt by Dr. Yamazaki to rely on a distinction between the abstract and the entire article is unpersuasive. The record as a whole leaves the Court with a clear conviction that Dr. Yamazaki was well aware of the Tsai article throughout the relevant period. And, expert testimony established by clear and convincing evidence that the 1983 Tsai article was highly material. Specifically, Tsai's article teaches the making of amorphous silicon with impurity concentrations in the amorphous silicon layer within the levels recited in all claims of the '132 patent. Dr. Fonash also testified that the Tsai article shows "you in great depth, in greater detail, how to attain those impurity levels, and has data showing how they actually did attain those impurity levels." He further testified that the Tsai article is directed to "large area device applications" which include TFT's.

Claim 7 of the '132 patent is directed to a TFT with low impurities. Accordingly, the evidence clearly and convincingly shows that disclosure of the Tsai article during the prosecution of the '132 patent would have given rise to a *prima facie* case of unpatentability.

### 3. The '423 and '488 Laid-open Applications

Dr. Yamazaki is the sole inventor on the '423 and the '488 Japanese laid-open applications, which were filed in 1982 and published by the Japanese patent office in 1984. Neither reference was disclosed to the PTO during the prosecution of the '132 patent. The '423 and the '488 laid-open applications have very similar disclosures. The '423 and the '488 are directed to solar cell technology, and specifically to the efficiencies to be achieved in photoelectric devices from low levels of impurities. Both laid-open applications conclude, however, that the "present invention is also effective for an insulated gate field effect semiconductor device having an NIN junction (*i.e.*, a junction comprising, in this order, a source or drain, a channel forming region, and a source or drain) or a PIP junction, as well as for a transistor having an NIPIN or a PINIP junction."[24] It is clear, therefore, that Dr. Yamazaki himself knew and believed that the '423 and '488 laid-open applications, though directed to solar cells, were also pertinent to TFT's.

Yet, Dr. Yamazaki testified during the hearing that he forgot that the '423 and '488 applications taught lowering impurities in insulated gate field effect semiconductor devices, and therefore he did not disclose them to the PTO in connection with the '132 patent prosecution. Specifically, he testified that because the '423 and the '488 dealt chiefly with solar cells, he thought that neither had any relevance to the '132 patent application. This contention is belied by the terms of the '423 and the '488 applications themselves, and by the convincing expert testimony of Dr. Tsai and Dr. Fonash. Most tellingly, though, Dr. Yamazaki's contention is flatly

---

**23.** *See* appendix. The Tsai article was also disclosed to the PTO on June 7, 1995 during the prosecution of the '636 patent application.

**24.** Indeed, the claims of the '423 are not limited to solar cells, but also claim semiconductor devices. Also worth noting is that the prosecution application was protracted, extending from 1982 to a rejection on appeal in 1992.

refuted by the fact that SEL referenced other works directed primarily to solar cells during its prosecution of the '132 patent, including one of Dr. Yamazaki's own U.S. solar cells patents, U.S. Patent No. 4,239,554, and an article by Magee and Carlson in a publication called "Solar Cells." Even if Dr. Yamazaki's testimony that he forgot about the specific passages contained in the '423 and the '488 applications describing their relevance to TFT's were plausible, it is not plausible that he forgot the scientific principle underlying those passages, *i.e.*, that the importance of reducing impurity levels is germane to both solar cells and TFT's.

Dr. Yamazaki also testified that he first became aware of the significance of the '423 and the '488 through a rejection by the Japanese patent office in his corresponding '250 application.[25] The rejection, mailed on October 19, 1994, was based in part on the disclosures in Dr. Yamazaki's '423 laid-open application. Further, Dr. Yamazaki remembered Toshiba representatives suggesting, during licensing negotiations in October 1994, that the '423 and '488 applications were prior art to the '132 patent. Dr. Yamazaki testified that he then looked into the matter. Significantly, Dr. Yamazaki thereafter, in January 1995, told his licensing agent that he considered the '423 and the '488 references to be more material to the '132 patent than other references already disclosed to the PTO. Tellingly, he further instructed his licensing agent not to disclose the '423 and the '488 laid-open applications to I.B.M., a prospective licensee.[26] This ploy failed as during his licensing meeting with I.B.M. in March 1995, I.B.M. representatives specifically called attention to the fact that Dr. Yamazaki had failed to disclose the '423 and '488 applications to the PTO as prior art in the '132 proceeding. Following the meeting with I.B.M., Dr. Yamazaki submitted the references to the PTO on April 20, 1995 in connection with the continuation application of the '494 application. Dr. Yamazaki also submitted the '423 and the '488 references to the PTO on June 7, 1995, in connection with the '636 patent application.

The materiality of the '423 and the '488 laid-open applications to the prosecution of the '132 application is pellucidly clear. Dr. Fonash convincingly testified that the elements in claim 7 of the '132 patent are taught in the '488 and the '423 laid open applications. The disclosures in the '423 were in fact, part of the basis on which the Japanese patent office had earlier rejected the corresponding '250 application. Thus, disclosure of the '423 and the '488 laid open applications during the '132 prosecution would have given rise to a *prima facie* case of unpatentability. They were highly material prior art.

### C. Additional Omissions During the '132 and the '636 Patent Applications

Samsung, during the inequitable conduct hearing, alleged two additional instances of material withholdings by SEL during the '132 and the '636 patent applications.[27] First Samsung claims that SEL deliberately failed to disclose as prior art Japanese Patent No. 58–2073 issued to Sony ("the Sony '2073 patent"), even though it was aware that the Sony '2073 patent was a basis on which the Japanese patent office rejected its corresponding '250 patent application. Second, Samsung contends that SEL deliberately failed to disclose the materials pro-

---

**25.** Although Dr. Yamazaki initially testified that he learned in 1992 that the '250 had been rejected in part because of the '423 laid-open application, he later clarified that it was not until 1994 that the '423 application was cited as a basis for the rejection. Had Dr. Yamazaki discovered in 1992 that the '423 was a basis on which his '250 application had been rejected, he would have been immediately placed on notice of his duty to disclose the '423 in connection with his pending '132 patent application. As Dr. Yamazaki testified, the Japanese '250 application has a "one-to-one" relationship with both the '132 and the '636 patents.

**26.** Specifically, in a January 1995 letter, Dr. Yamazaki instructed his licensing agent that:

We think SEL's laid-open applications indicated in our letter of January 10, 1995 would be more relevant than any other materials. Please be careful not to disclose these laid-open applications to I.B.M.

**27.** These additional allegations of inequitable conduct were raised for the first time at the hearing. Accordingly, the evidence adduced concerning these allegations is considered for the limited purpose of ascertaining SEL's motive, plan, and intent with respect to the '636 patent. *See* Rules 402, 403, 404(b), Fed.R.Evid.

duced in connection with Dr. Yamazaki's 1983 Reston Virginia speech, even though these materials discuss the importance of low levels of impurities in electronic devices.

### 1. The Sony '2073

Dr. Yamazaki testified that in 1992, when he originally received the rejection of the '250 Japanese laid-open application, the Sony '2073 was cited as one basis for the rejection.[28] Mr. Yamamoto, who also learned of the basis for the '250 rejection in 1992, thus initially instructed SEL's patent attorney to disclose the Sony '2073 reference to the PTO in connection with an application within the '250 application–'132–'636 chain.[29] Inexplicably, SEL later instructed its patent attorney to file an Information Disclosure Statement ("IDS") in connection with the application that omitted the Sony '2073 reference. The '250 application was finally rejected by the Japanese patent office in October 1994 based on the disclosures in the Sony '2073 and Dr. Yamazaki's own '423 laid-open application. Yet, the Sony '2073 was not disclosed as prior art during the prosecutions of the '132 or the '636 patents. And significantly, the Sony '2073 patent was not a reference that was asserted against SEL by a prospective licensee, as were the Tsai article and the '423 and '488 applications that were eventually cited to the PTO by SEL in the '636 proceeding, but omitted from the '132 proceeding.

Thus, by 1992, SEL was aware that the '250 application, which Dr. Yamazaki conceded has a "one-to-one" relationship with both the '132 and the '636 patents,[30] had been rejected by the Japanese patent office based in part on the Sony '2073 patent. Yet, it failed to disclose the reference to the PTO despite the specific admonitions found in Rule 56.[31] Further, Dr. Fonash testified that the Sony '2073 combined with the '423 application rendered obvious every element of Claim 1 of the '132 patent. Thus, the Sony '2073 was clearly a highly material reference that came to the attention of Dr. Yamazaki during the '132 application and well before the prosecution of the '636 application.

### 2. The Reston Materials

Dr. Yamazaki testified that his May 1983 speech in Reston, Virginia concerned the development of low impurity levels in the semiconductor layer. The speech was thus antecedent to, and concerned the same subject matter as, the August 1983 Tsai speech. Notably, Dr. Yamazaki conceded that the speech and related materials disclose the importance of low levels of impurities and "would be important" on this issue. An abstract from Dr. Yamazaki's speech was published, and he eventually published a full paper in the Journal of Non–Crystalline Solids. SEL did not disclose any of these materials to the PTO during its prosecution of either the '132 or the '636 patent applications. And significantly, unlike the references disclosed in the '636 proceeding but not in the '132 proceeding,[32] none of these materials was asserted against SEL by a prospective licensee in the course of licensing negotiations on these patents.

Dr. Yamazaki gave inconsistent testimony with regard to the materiality of his Reston speech and materials. He initially testified at the hearing that he only became aware of

---

**28.** The Japanese patent office later cited to the '423 laid-open application as an additional basis for rejection.

**29.** Specifically, this was Application No. 885,643, which was filed on May 19, 1992, and which was later abandoned. *See* appendix.

**30.** Both of which also rely on the '250 application for priority stemming from the '250 application's May 1984 filing date. This, of course, is significant in assessing the patentability of the invention claimed in the '132 and '636 patents.

**31.** In connection with an applicant's duty to disclose all information known to be material to patentability, 37 C.F.R. § 1.56 specifically "encourages" applicants to examine:

> (1) Prior art cited in search reports of a foreign patent office in a counterpart application, and
>
> (2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentability defines, to make sure that any material information contained therein is disclosed to the Office.

**32.** Such as the Tsai article and the '423 and '488 laid-open applications.

the importance of the Reston materials during the Spring of 1996, and even then, only considered them to be important with regard to the '204 patent. Dr. Yamazaki testified that he did not submit the materials to the PTO because the '204 patent had issued prior to the Spring of 1996. Later, however, Dr. Yamazaki seemed to retreat from this position, stating that he did not understand the Reston materials to be prior art, even with regard to the '204 patent. Further, Dr. Yamazaki stated that his discussion at Reston was in fact cumulative of other references cited during the '636 prosecution. Yet, Dr. Yamazaki also stated, inconsistently, that the one-page abstract from his Reston speech did not overlap with other references cited. In any event, the record is inconclusive on whether the Reston speech was material prior art.

### D. The '204 Patent Application

Samsung alleges two instances of inequitable conduct by SEL during its prosecution of the '204 patent. First, Samsung contends that SEL deliberately withheld reliable test results which conclusively established that prior art devices attained lower impurity levels than those claimed in the '204 patent. Second, Samsung contends that SEL knowingly overstated the efficiency levels achieved in the '204 patent in arguing for patentability.

Again, the threshold issue is the relevance of any inequitable conduct by SEL in connection with its prosecution of the '204 patent. And, in this regard, it is significant that the '204 patent is not a part of the '250 application–'132–'636 chain. Samsung contends, however, that where inequitable conduct is found in an application that results in an issued patent, that misconduct may render a closely related patent-in-suit unenforceable. This contention is an application of what is sometimes referred to as the "infec-

tious unenforceability" doctrine. Relying on this doctrine, Samsung contends that because the '204 patent and the '636 patent have a common inventor, common owner, similar prior art references, and a similar subject matter (*i.e.*, inventions relating to low impurity levels), inequitable conduct during the prosecution of the '204 patent may be sufficient to render the '626 patent unenforceable.

This argument, like Samsung's argument in connection with the '132 patent, also requires an extension of existing law. To date, no Federal Circuit decision has applied the infectious unenforceability doctrine based solely upon such commonalities. *See Consolidated Aluminum*, 910 F.2d at 812 (infectious unenforceability applied where inequitable conduct during prosecution of one patent "permeated the prosecution of the other" patents-in-suit).[33] And, because SEL's inequitable conduct during its prosecution of the '636 patent application is sufficient to render the claims of the '636 patent unenforceable, this issue need not be reached.

Moreover, the alleged misconduct during the prosecution of the '204 patent is too remote from the patent-in-suit to be probative of SEL's plan, motive, intent and pattern and practice with regard to the '636 patent. *See* Fed.R.Evid. 402, 403, & 404(b). The information allegedly withheld and mischaracterized during the prosecution of the '204 patent is not information that was material to the prosecution of the '636 patent. And, there is no suggestion that the alleged misconduct was connected to, or of consequence, during SEL's subsequent prosecution of the '636 patent. Thus, Samsung has failed to establish the relevance of the alleged misconduct with respect to the patent-in-suit.

### IV.

It is clear that SEL knowingly made several highly material withholdings and mis-

---

**33.** In *Consolidated Aluminum*, the Federal Circuit found that the patentee's inequitable conduct during the prosecution of one patent enabled it to make "argument[s] it could not have made" in prosecuting the applications that became the other patents-in-suit. 910 F.2d at 811. Therefore, the patentee's misconduct "permeated the prosecution of the other patents-in-suit." *Id.* at 812. On this basis, the court held that the inequitable

conduct in prosecuting the one patent had the "immediate and necessary relation" to the equity sought be the patentee, namely the enforcement of the other patents-in-suit, to render them similarly unenforceable. *Id.* at 811–812. In the instant case, there is no such relation between the alleged misconduct during the prosecution of the '204 patent and the sought after enforcement of the '636 patent.

characterizations during the prosecution of its '132 and '636 patent applications. The issue of intent remains. And in this regard, it is worth restating that the "materiality of an undisclosed reference does not presume an intent to deceive." *Halliburton*, 925 F.2d 1435. Yet, where, as here, a patentee faces a "high level of materiality and clear proof that it knew or should have known of that materiality, it can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead." *Critikon*, 120 F.3d at 1257. In such circumstances, a "mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice." *Id.* In the final analysis, intent is a judgment that must be made on the totality of the circumstances; courts must determine whether an applicant's conduct, when "viewed in light of all the evidence, including evidence indicative of good faith, ... is culpable enough to require a finding of intent to deceive." *Halliburton*, 925 F.2d at 1443.

In the instant case, a review of the record as a whole points clearly and convincingly to the conclusion that SEL's conduct before the PTO with regard to the '636 is sufficiently culpable to warrant a finding of intent to deceive. The evidence clearly reveals that Dr. Yamazaki is an accomplished inventor who is intimately involved in the prosecution of his patent applications. As he testified, "patents are my life. They are very important to me." Securing a patent on the '636, given its revenue generating potential, was particularly important to Dr. Yamazaki and his company. In pursuit of this goal, the evidence shows clearly that Dr. Yamazaki compromised his fundamental duty of candor to the PTO.

Thus, SEL submitted to the PTO a full Japanese language version of the Canon '968 application, but only a one-page partial English translation. The partially translated portion of Canon disclosed only one of the elements of the asserted claims in the '636 application, the silicon nitride gate insulator. Further, SEL identified the relevance of the Canon '968 application to the PTO only as "disclos[ing] the use of silicon nitride for a gate insulating layer of a thin film transistor." Yet, clear and convincing expert testimony established that the untranslated portions of the Canon '968 application disclosed other elements of the structure found in the '636 patent; *i.e.* the same intrinsic semiconductor layer, the same sandwich structure, and the admonition to avoid impurities. The Canon '968 thus contained the most complete combination of the elements described in the '636 patent. These same elements, such as the limitation of an intrinsic semiconductor layer, were used by SEL to distinguish the '636 patent application from prior art. And, given that Dr. Yamazaki decided to submit just a partial translation of Canon, it is simply not credible that Dr. Yamazaki was unaware that the untranslated portions of the Canon '968 application disclosed the additional elements [34] described in his '636 patent application. These elements, of course, formed a basis for SEL's patentability argument.

SEL contends that its decision to provide the PTO with a full Japanese language version of the Canon '968 application and a partial English translation, along with 90 other references of prior art, is indicative of its good faith compliance with the duty to disclose. Yet, far more plausible, on this record, is that SEL's submission of a partial translation was an effort to conceal from the PTO the full importance of the Canon '968 application; *i.e.*, that it disclosed the same structure found in the '636 patent, and not merely one of its elements. While SEL correctly notes that the patent examiner could have secured a full translation from within the PTO,[35] SEL's brief statement of relevance identifying only the silicon nitride gate as pertinent, coupled with the partial translation disclosing that element, certainly removed any incentive to do so. Thus, the evidence points clearly and convincingly to the conclusion that (1) SEL knew that a full translation of Canon, which disclosed the same TFT structure as described in the '636, would decrease the likelihood of the '636 patent being issued, and (2) it knowingly

---

**34.** That is, in addition to the silicon nitride gate insulator.

**35.** *See* Manual of Patent Examining Procedure § 901.05(d).

concealed the full importance of the Canon '968 reference in an effort to mislead the PTO.

SEL also disclosed to the PTO the Tsai article, which, as expert testimony clearly and convincingly established, is highly material to the subject matter of the '636 patent, as it teaches the making of amorphous silicon with impurity concentrations within the levels recited in all claims of the '636 patent. Also clear from the record is that SEL's efforts to distinguish the Tsai article, based on its application primarily to solar cells and on the perpendicular direction of the current flow, were not only invalid, but also inconsistent with its own position on the subject. Thus, in a January 1995 letter to his licensing agent for the '132 patent, Dr. Yamazaki concedes that "we do not think there is a more relevant reference than C.C. Tsai's abstract of August 22, 1983 and his (sic) papers of December, 1983." In his '423 and '488 laid-open applications and his '400 patent application, Dr. Yamazaki clearly recognized that inventions directed to low levels of impurities in solar cells are highly relevant to TFT's. Moreover, SEL's argument before the PTO is flatly belied by the fact that in this very infringement action, SEL originally asserted two patents against Samsung that are directed mainly to low levels of impurities in solar cells, the '204 and the '400 patents. Thus, the record points clearly and convincingly to the conclusion that in distinguishing the Tsai article before the PTO, SEL knowingly advanced a meritless argument in an effort to mislead the PTO.[36]

Moreover, SEL's motive for engaging in such conduct is illuminated by Dr. Yamazaki's testimony of why, following the issuance of the '132 patent, he felt compelled to file the application which led to '636 patent. In essence, Dr. Yamazaki testified that he knew, after meeting with several prospective licensees who called attention to SEL's withholdings during the '132 prosecution, that his potentially lucrative patent was vulnerable. To remedy this problem, he decided not to seek reissue of the '132 patent,[37] but to pursue a new patent on the same invention that would be immune from the problems that infected the '132 patent. Thus, SEL filed and pursued the '636 patent. In doing so, SEL was not required to surrender the '132 patent or to disclose the specific errors that were made in connection with the prosecution of that patent.[38]

Yet, SEL still had to avoid the prior art references that it was now forced to disclose to the PTO, such as the Tsai article and the '423 and the '488 applications. Thus, SEL mischaracterized the Tsai article as applying primarily to solar cells. Further, as Dr. Yamazaki testified, SEL had to limit the claims of the '132 patent.[39] Specifically, the '636 patent is limited to an IGFET with a *silicon nitride* gate, and an *intrinsic* silicon layer, and a *sandwich* structure in the channel region, while the claims in the '132 patent are not so limited. Of all the references cited to the PTO in connection with the '636 patent application, only the Canon '968 application describes a TFT containing each of these three elements. Clearly, then, the Canon '968 was a highly material reference to the '636 patent application, which posed a significant threat to rendering the '636 unpatentable. It is simply implausible, under the circumstances, that SEL was not aware of this fact. Rather, the evidence points clearly and convincingly to the conclusion

---

36. It is worth noting that advocacy before the PTO is appropriate. But, there is a line between legitimate advocacy in accordance with the duty of candor, and advocacy that the applicant surely knows has a propensity to mislead the examiner. Here, that line was crossed.

37. Reissue is the well-established procedure available to patentees who have inadvertently and without any deceptive intention made errors before the PTO. This procedure first requires surrender of the patent at issue as well as a specification of errors or omissions previously made. *See* 35 U.S.C. § 251.

38. Note, however, that the result reached here does not depend in any way on SEL's decision not to surrender and seek reissue of the '132 patent, nor does this decision suggest that SEL had a duty to do so.

39. Specifically, when asked why he limited the claims of the '636, Dr. Yamazaki testified that "there were these various references. These references were to be avoided, but I don't believe that the essential nature of the invention also [was] changed."

that SEL's awareness of this fact motivated its decision to submit just the partial English translation in an effort to hide material information.

Finally, when viewed in conjunction with SEL's conduct during the prosecution of the '132 patent application, the record as a whole reflects a clear pattern and practice of initial nondisclosure, followed by incremental disclosure only when compelled by the circumstances to do so, followed, at times, by mischaracterization. Thus, SEL intentionally withheld four material prior art references; the Tsai article, the '423 and the '488 laid-open applications, and the Sony '2073 patent. The record as a whole points clearly and convincingly to the fact that SEL knew of these materials during the pertinent period. Yet, SEL disclosed the references to the PTO only when forced to do so by a prospective licensee. Thus, the Tsai article and the '423 and '488 applications were cited to the PTO only after these matters were asserted by prospective American licensees during negotiations, whereas the Sony '2073, which was called to SEL's attention by the Japanese patent office and not a potential licensee, was never disclosed to the PTO.

And, after receiving an initial rejection of the '132 patent based on the impurity levels in the Nakagawa '477 patent, SEL submitted to the PTO an amendment which erroneously calculated the level of impurities disclosed in the Nakagawa '477 patent as $4 \times 10^{19}$ atoms/cm$^3$. The error, for which no satisfactory explanation was provided, conveniently provided SEL with a basis from which to overcome the Nakagawa '477 patent. And when prosecuting the '636 patent application,

the patentability of which was dependant on its specific limitations combined with its impurity levels, SEL concealed the importance of the Canon '968 application and disingenuously distinguished Tsai.

The evidence demonstrates a sophisticated, subtle, and consistent effort to hide the ball from the PTO in a manner plainly at odds with an applicant's duty of candor, good faith, and honesty. The record, as a whole, simply contains too many instances of information withheld, and references mischaracterized, to reach any conclusion other than that the withholding and mischaracterizations were part of an intentional, not accidental or inadvertent, plan to mislead the PTO.

## V.

During its prosecution of the '636 patent application, *SEL* knowingly made two highly material withholdings and/or mischaracterizations. The prior art references withheld and/or mischaracterized were not trivial, but rather were central to the essential question of patentability. The evidence points clearly and convincingly to the conclusion that this conduct was performed with the intent to deceive the PTO. Consideration of *SEL's* conduct in connection with the prosecution of the '132 patent only bolsters this conclusion. Thus, SEL engaged in inequitable conduct during the prosecution of the '636 patent, and accordingly, the entire patent is unenforceable.

For the foregoing reasons, SEL's patent infringement suit against Samsung must be dismissed with prejudice.

An appropriate order shall issue.